## THE FALCON.

1. A steamer running at the rate of from eight to ten knots an hour, on a bright moonlight night, in an open bay, with nothing to mislead her, condemned for the loss of a schooner sailing with a six-knot breeze, whose only fault was alleged to be a false manœuvre in the moment of impending collision. The court declares it to have been the " duty of the steamer to see the schooner as soon as she could be seen, to watch her progress and direction, to take into account all the circumstances of the situation, and so to govern herself as to guard against peril to either vessel."

2. Where the libel alleged that the loss by the collision was substantially a total loss, and the answer substantially admitted this—the vessel having sunk in Chesapeake Bay in five fathoms water, and it being clear from the proofs that she could not have been repaired without a large expenditure of time and money—*held*, that the fact that she was finally raised, repaired, and put in good condition, was no defence to a claim for a total loss;—especially as it did not appear at whose instance or at what cost this was done; nor by what right those in possession of her held her; and it not being either alleged or proved that she had been tendered back to her original owners. The case distinguished from *The Baltimore* (8 Wallace, 378).

3. But this decree for a total loss declared to bar any claim to the schooner by her former owners, and that their title should be remitted to the owners of the steamer.

APPEAL from the Circuit Court for the District of Maryland, reversing a decree of the District Court for the said district, in which, on a libel filed by the owners of a small schooner, the Mary Banks, of one hundred and eighty-six tons, against the steamer Falcon, for a *total loss* by collision, the District Court had condemned the steamer for the total loss asserted.

*Mr. W. C. Schley, for the appellant; Messrs. J. H. B. Latrobe and S. T. Wallis, contra.*

Mr. Justice SWAYNE stated the facts or evidence, and delivered the opinion of the court.

On the 21st of June, 1867, about half-past one o'clock, A.M., the schooner Mary Banks was proceeding up the Chesapeake Bay to Baltimore. The steamer Falcon, on her way to Charleston, came in view. The night was clear and bright, with moonlight and starlight. The waters of the bay were calm. The schooner was under way with a six-knot breeze. The steamer was making from eight to ten knots an hour. The captain of the steamer says: " My steamer is one hundred and sixty-five feet long, or thereabouts. I had about three miles navigable water on my starboard bow. On my larboard bow I had all of five or six miles of navigable water. There was no obstacle to the navigation of this sea-room except the schooner." The

vessels approached each other and came in collision.  The steamer struck the schooner.  The answer admits " that the said schooner was cut half in twain, and not altogether in twain, as charged;" a difference of small moment, however, inasmuch as it is admitted that she sank in consequence of the collision.  The sinking was immediate.  The crew were rescued by the steamer and landed at Fortress Monroe. The answer alleges that the collision was caused by the fault of the schooner in porting her helm and coming suddenly under the bow of the steamer when it was too late for the latter to avoid her.  The District Court adjudged the steamer to have been solely in fault, and decreed accordingly.  The respondents appealed to the Circuit Court.  There the decree of the District Court was reversed and the libel dismissed.  The libellants appealed to this court, and the decree of the Circuit Court is thus brought before us for review.

This is a simple case.  No searching analysis of the testimony is necessary to enable us to find the proper conclusions.  It was the duty of the steamer to keep out of the way of the schooner.  She had at command all the means to do so.  There was ample sea-room, calm weather and water, abundant light, and no other vessel in proximity on her larboard or starboard side.  None other is mentioned as in sight.  It was the duty of the steamer to see the schooner as soon as she could be seen, to watch her progress and direction, to take into account all the circumstances of the situation, and so to govern herself as to guard against peril to either vessel.

The steamer was grossly in fault in approaching so near the schooner and at so high a rate of speed.  This was the source of the disaster that followed.  The only fault imputed to the schooner is that almost at the moment of the collision she ported her helm.  This fact is not satisfactorily established by the testimony.  The proof is that the captain said so after reaching the steamer.  He denies it.  The mate says, "I kept my course steadily north by west."  He

was cross-examined by the respondents' counsel, but no
question was asked as to this point. There is no other evi-
dence upon the subject. What was deemed due to porting
the helm may have been the effect of the wind after the
helmsman fled from his post. If the fact were as claimed it
would not mitigate the fault of the steamer. Nor can the
desertion of the helmsman at such a time have that effect.
The peril was immediately impending. The safety of the
vessel and the lives of the crew were at stake. A moment
later the collision occurred. The helmsman in his flight
was thrown down by the shock and broke his leg. The ves-
sel sank, and the crew would have gone down with her but
for the aid of the steamer. If in an emergency so sudden
and so alarming an order were given which should not have
been given, or an act were done which should not have been
done, the law regards it an error and not a fault, and holds
the offending vessel to be the cause, and liable as if it had
not occurred.

We think the decree of the District Court was in all
things correct, and should have been affirmed.

After the case was appealed to the Circuit Court, and be-
fore the hearing there, the respondents took testimony show-
ing that the schooner had been raised, repaired, and put in
good condition. At whose instance and at what cost this
was done, and by what right those in possession claimed to
hold her, are not shown; nor is it alleged or proved that she
was ever tendered back to the appellants. The appellees
insist that the facts disclosed entitle them to have the decree
of the Circuit Court affirmed, and rely upon the case of *The
Baltimore** as an authority to that effect. This is a mistaken
view of the subject. In the case of *The Baltimore* the libel
alleged a total loss. The answer expressly denied it. There
the sinking was in the river Potomac. The water was
shoal. The masts projected eighteen feet above its surface,
and the position of the hull was clearly discernible. The

---

* 8 Wallace, 378.

vessel could have been easily raised and repaired. Here the libel alleges substantially a total loss, and the answer substantially admits it. No point to the contrary was raised or suggested. The schooner was sunk in the Chesapeake Bay, where the water was five fathoms deep. It is clear, from the proofs, that she could not have been raised and repaired without a large expenditure of time and money. The case of *The Baltimore* has, therefore, no application to the case before us.

This subject has been under consideration upon two occasions in the English admiralty court. In *The Empress Eugenie*,* the owner had raised and repaired the vessel. The cost of the repairs exceeded the original value of the vessel, and this might have been ascertained before the repairs were commenced. It was held that the measure of damages was the value of the ship before the collision, with interest from the date when the cargo would, in the ordinary course, have been delivered, together with the cost of raising and the cost of placing the ship in the dock for inspection, less the value of the wreck as raised. It was said "that it was a mistake to have repaired her at all, and that it would have been better to have abandoned her from the first."

In the case of *The Columbus*,† that vessel had sunk the fishing-smack Tryall. The owner of the Columbus raised the smack and carried her into Rye Harbor. Notice of this was given to the owner of the smack, with an intimation that the owner of the Columbus was ready to deliver her up and would not be responsible for any further damage or expense that might be incurred by her remaining unrepaired in the harbor of Rye. It does not appear whether she was repaired or not. Dr. Lushington said: "The rule which I consider it incumbent upon this court to follow is this, that if a vessel is not merely run into and partially damaged, but is actually sunk at sea, it is not incumbent upon the owner of that vessel to go to any expense whatever for the purpose

---

* 1 Lushington, 139.　　　　　　† 3 W. Robinson, 161.

of raising her." He said further, that the owner of the smack " was not bound to repair her, and might have left her lying in the port," and that the proper course would have been to apply to the court for an order that the smack be sold and the proceeds brought in to abide the result of the suit. The Columbus was held liable for the full value of the smack as if there had been a total loss; but it was also held that the owner of the Columbus might still apply for an order to sell the smack, and that " the proceeds of such sale will be his own property." Whether, if the smack had been repaired and then tendered back, her owner would have been bound to receive her, is a point not touched upon, and which it is not necessary here to consider.*

Upon the authority of *The Columbus*, it is clear that the steamer is liable for the full value of the schooner at the time of her loss. We think that case lays down the proper rule.

There may be interests and complications touching the schooner in relation to which we are not advised and which are not represented in this litigation. We cannot, therefore, order her to be sold and the proceeds to be paid to the owners of the steamer. But, where there is an abandonment by the assured to the assurer, the title of the property passes to the latter. So, where in an action of trespass or trover there is a recovery of the full value of the property to which the action relates, the title of the plaintiff is transferred *ipso facto* to the defendant. In analogy to the principle of these cases, we adjudge that the decree to be pronounced against the steamer shall bar any further claim to the schooner on the part of the appellants, and that their title shall be thereby remitted to the appellees.

DECREE REVERSED, and the case remanded to the Circuit Court with directions to enter a decree

IN CONFORMITY TO THIS OPINION.

---

* 1 Parsons's Shipping and Admiralty, 543.