FARR and others *v.* THE BRITISH STEAMSHIP FARNLEY.

*(District Court, D. Maryland.* March 30, 1880.

COLLISION—STEAMER AND VESSEL—BURDEN OF PROOF.—In case of a collision between a steamer and sailing vessel, the steamer is held in 'ault unless it can be shown that she was prevented from performing her duty by some fault on the part of the sailing vessel.

SAME—IMPENDING DISASTER—DUTY OF MASTER.—Where the collision was impending through the fault of the steamer, the master of the sailing vessel is only required to act with reasonable skill and judgment.

In Admiralty.

*Brown & Smith,* for libellants.

*Thomas & Thomas,* for claimant.

MORRIS, J. Collision between the schooner A. R. Weeks and the steamship Farnley.

The libel alleges that the schooner A. R. Weeks, 445 tons, laden with coal, sailed from Baltimore for Boston on the eighth of September, 1879, and was proceeding down the Chesapeake bay with a seven-knot breeze from the north-west, her course being S. by E. $\frac{1}{2}$ E., and on her starboard tack, with all her proper lights burning, when, at 7:30 P. M., the lookout noticed a mast-head light, distant nearly five miles, and soon after discovered a green light; that those in charge of the schooner continued to watch the mast-head and green light until the hull of the steamship could be seen; that when the lights were first seen they bore about one point on the schooner's starboard bow; that the schooner continued her course until the vessels were about a cable length apart,

the steamer continuing still on the schooner's starboard bow, when suddenly the steamer showed her port light, and came squarely across the course of the schooner; that the schooner had continued to hold her course during all the time, but when it was discovered that a collision was unavoidable the master of the schooner ordered her helm to starboard, in the hope of easing the force of the blow; but the starboard bow of the schooner struck the port side of the steamship, forward of the bridge, and the schooner was so injured that she filled with water and sank within an hour.

The answer of the claimants of the steamer alleges that she was proceeding up the bay at four miles an hour, using but one of her boilers, the other being disabled, but with speed sufficient to make her respond to her helm; that her regulation lights were properly placed and burning, a Chesapeake bay pilot on her main bridge, her mate on the skeleton bridge, and a lookout on the bow, when, a little after 7 P. M., the pilot and mate saw, with the aid of a glass, the sails of the schooner, four or five miles off, *a quarter of a point* on the steamer's port bow; that at 7:20 P. M. the pilot and mate saw, and the lookout reported, the red light of the schooner three-quarters of a point over the steamer's port bow, between three and four miles off; that the helm of the steamer was ported, *and in few seconds put hard a-port,* causing the steamer to fall off more than three points to the starboard; that the vessels continued to approach until within less than a quarter of a mile apart, the schooner being then between three and four points on the steamer's port bow, and her red light only visible, when she suddenly starboarded her helm and turned her head directly across the track of the steamer, exhibited only her green light, and ran into the steamer; that the speed of the schooner was from seven to eight miles an hour, and that of the steamer four, so that their combined speed was between 11 and 12 miles, and that after the schooner changed her course there was not time to check the speed of the steamer, but her best plan was to try to pass before they should come together.

The libellants produced the master of the schooner, whose

watch it was, and who was on deck at the time of the collision; the second mate, who was at the wheel; and the lookout, who was stationed in the schooner's bow. Their testimony supports the allegations of the libel, and all say that until just prior to the collision they continued to see the green light of the steamer over the schooner's starboard bow, and that the schooner held her course.

The master says that when the steamer showed her red light she was from 300 to 400 yards off, and that she then turned nearly at right angles to the schooner's course; that when he gave the order to put the schooner's helm hard starboard, the steamer's bow was nearly up to the line of the schooner's course, and she was from only 150 to 200 feet off.

The lookout says he kept the green light in sight until he saw the hull of the steamer looming up, then he saw her swing around very fast, and saw her broadside almost as soon as he saw her red light; that when he heard the master sing out to the man at the wheel, the schooner's bow was pointing to about the fore rigging of the steamer, and he was then sure a collision could not be avoided. The wheelsman testifies that when the lookout reported the green light he saw it, and that it bore about a point over the starboard bow, and that he also saw the red light when reported, and that, when the captain ordered the wheel to starboard, the steamer was 100 to 150 feet off, and her bow just crossing the line of the schooner's course.

The first mate and steward of the schooner, who were brought on deck by the hallooing, corroborated these statements, so far as they had opportunity of witnessing the occurrences.

This is the case for the libellants. The law having put upon the steamer the duty and responsibility of keeping out of the way and avoiding collision with a sail vessel, when a collision does occur the steamer is held in fault unless she can show that she was prevented from performing her duty by some fault on the part of the sailing vessel.

Let us see whether the claimants of the steamer have succeeded in showing this. The pilot in charge of the steamer

says he made out the schooner's sails with the aid of a glass from the main bridge, *directly ahead*, and about three-fourths of an hour afterwards saw her red light one and one-half points on the steamer's port bow; that he was steering by the Polar star, and the steamer's course was N. ½ W. and he says the schooner's proper course down the bay from her then position was S. by W. He says that if the vessels had continued the courses they were then on they would have passed port to port *a mile apart;* that when they got within a mile of each other, not fearing a collision, but from extra caution, he ordered the steamer's helm to port and continued under a port helm until the schooner was several points on his port bow, and about abreast of him, and about a quarter of a mile off, when, seeing both the lights of the schooner, he ordered his helm *hard a-port* and ran half a mile under the *hard a-port* helm, having run about two miles in all from the time he first put his helm to port up to the time of the collision, and having gone off in all seven and one-half points from his original course; that is to say, half a point only less than a right angle.

The first mate of the steamer was on the skeleton bridge, and his testimony as to the intervals between the orders to port and to *hard a-port* the steamer's helm is somewhat different. He says he saw the schooner first four or five miles off, nearly ahead, and then saw her red light three-fourths of a point on the steamer's port bow; that he called to the pilot, who said, "It is all right, she is showing us her red light, and is on our port bow;" that the vessels continued to show red to red until five minutes before the collision; then the helm was ported, *and when the steamer had gone her length the pilot* ordered it *hard* a-port; that the steamer was going under the *hard* a-port helm when he saw the schooner's green light, and the collision occurred shortly after.

The wheelsman of the steamer also says he saw the schooner's red light; that his attention was called to it by the lookout singing out "A light on our port bow;" that the order was *then* given to him to port, and *immediately after* hard a-port; that the steamer fell off from N. by E. to E. ¼ N.,

*i. e.*, about seven points in all. Afterwards, he says, he saw the schooner's red and green lights, and then she struck the steamer. The lookout of the steamer was not produced as a witness.

It is by this explanation of the occurrences preceding the collision, contained in the testimony of the pilot, the mate and the wheelsman, that the claimants of the steamer seek to show that the disaster was altogether brought about by the fault of the schooner; but to my mind the account they give of the movements of the two vessels, and the causes of the collision, is incomprehensible and incredible. The schooner was on her course down the bay; she had the wind fair, and not the slightest reason, so far as can be seen, to change her course. And these witnesses would have the court believe that when the vessels were a mile apart they were red to red, and in such positions that if each had continued her course they would have passed from 200 yards to a mile apart; that out of superabundant caution, when he first saw the red light, about a mile off, the pilot ordered the steamer's helm to port, and afterwards *hard* a-port, and that the steamer ran two miles, describing nearly a quadrant, and therefore necessarily greatly increasing the distance at which they must pass each other. Yet these witnesses insist that somehow or other the schooner, without changing her course, got within a quarter of a mile of the steamer; that she then starboarded her helm, and, pursuing the steamer, ran into her. Not only, as it seems to me, are these alleged movements of the schooner unaccountable, but it is hardly less incomprehensible why, if, as these witnesses testify, the vessels were about to pass at such safe and increasing distances, the steamer should, before any change was observed in the schooner's course, put her helm to port, and, as some of the witnesses say, and as the answer avers, immediately afterwards *hard a-port*, so that she turned nearly a right angle to her former direction. If, however, the fact was that those on the steamer mistook the course of the schooner, and supposed it to be west of south, as the pilot and mate of the steamer both say they thought it was, instead of S. by E. ½ E.

as those on board the schooner say it was, and as their proper course, by the chart, should have been, and they supposed, until they got close to her, that she was going off the westward, when she was really going to the eastward, then all the maneuvers of the steamer and the consequent collision are accounted for. Or, if it be the fact, as seems possible, that those navigating the steamer did not see the schooner at all until just before the collision, but must have been observing another vessel, then the collision is accounted for. But no theory advanced by the claimants is, to my mind, sustained by the weight of testimony, or free from startling improbabilities.

The claimants rely, with some confidence, upon the testimony of Harper, the chief engineer of the steamer, to prove that the schooner must have been on the port side of the steamer. He says he looked out from the engine-room door, on the steamer's port side, and saw the schooner's red light, and it is manifest that he could not, from his position, see any object on the steamer's starboard side. He says: "I saw this red light for about half a minute, then saw both her red and green lights, and shortly after that the collision took place." It is, therefore, quite possible that when he looked out and saw the red light it was because the steamer had so far crossed the line of the schooner's course as to bring the schooner's red light where he could see it.

Nor does the testimony of the steward prove the claimant's defence. He was some 200 feet from the bow—the steamer being 280 feet long—and not in a position favorable for observation. In his examination in chief he says: "I looked over the port rail and I saw a red light one-half to three-quarters of a point on our port bow, and from three-quarters to a mile off. Our ship was falling off to starboard under a port helm, and I continued to observe this light until she was just ahead of us, about 200 yards off, and then the next I saw she was coming right into us." He afterwards qualified his statement, and says he does not know whether or not the helm was ported or not when he first saw the red light, but he says he did notice, after he saw the red light,

that the steamer's head was falling off, but he does not explain how it was that he continued to see the schooner's light *right ahead* of the steamer until just before she came into them.

All the witnesses on both vessels agree that the schooner maintained her course until just prior to the collision, when she put her helm hard starboard, and went off to the eastward.

In my view of the case, it now only remains to be considered whether this starboarding her helm was a fault on the part of the schooner. Those on board of her testify that when this order was executed the collision was unavoidable; and her master says that he thought then, and still thinks, that if she had continued her course she would have struck the steamer a more direct blow, and would have sunk both vessels, and that it was a proper manœuver to lessen the force of the blow. I am inclined to think from the evidence that this was probably a mistake, and that if the schooner had ported her helm she might have passed under the steamer's stern; but this mistake of judgment—if, indeed, it was a mistake—is not, I think to be visited upon the schooner. It was the steamer which had brought about the peril, and all that could then be required of those in command of the schooner was to act with reasonable skill and judgment, in the face of an impending and unexpected disaster, and I do not think it has been shown that the master of the schooner did not so act. *The Lucille,* 15 Wall. 679; *The Carroll,* 8 Wall. 302; *The Western Metropolis,* 6 Blatch. 210; *Leavitt* v. *Jewett,* 11 Blatch. 419; *The City of Paris,* 9 Wall. 638; *The Falcon,* 19 Wall. 75.

I find the steamship to be solely to blame for this collision, and pronounce in favor of the libellants.