## THE ERNEST A. HAMILL.

### (District Court, D. Washington, N. D.   March 20, 1900.)

1. COLLISION—TOWING SCOW WITHOUT LIGHT—FAILURE TO OBSERVE SIGNALS.
   The steamer Hamill was towing a scow at night on a 230-foot hawser, and with no light upon it, although she carried proper lights upon her mast. For several miles she was followed by the steamer Beaver, which was on a course to the starboard of the Hamill, and about a quarter of a mile astern, when the latter came opposite her port, and swung to starboard, signaling for the Beaver to pass under her stern. As the Beaver did not at once change her course, the Hamill gave a danger signal, which was not heeded until the Beaver was nearly upon the scow and saw it, when her engines were stopped, but not reversed, and she came into collision with the scow and was sunk. *Held*, that the two vessels were equally in fault,—the Hamill in failing to keep a light on the scow, and in attempting under such circumstances to pass across the bows of the Beaver without signaling for the latter to stop; and the Beaver in failing to observe the signal light on the mast of the Hamill, and to heed at once the latter's danger signal, even if it was not understood.

2. SAME—MEASURE OF DAMAGES.
   Where a vessel was sunk in a collision in a safe harbor, and near her home port, where facilities for raising and repairing her were readily obtainable, the necessary cost of such raising and repair, and demurrage for the time lost, is all that will be allowed as damages, when less than her value.

In Admiralty. Suit in rem by the owners of the steamer Beaver to recover damages for injuries to their vessel caused by a collision with a scow being towed by the steamer Ernest A. Hamill. The court finds that the Beaver and the Ernest A. Hamill were equally in fault. Decree that the libelants recover half the amount of damages proved, and half costs.

Fairchild & Bruce and Metcalfe & Jurey, for libelants.

Kerr & McCord, for claimant.

HANFORD, District Judge. After making due allowance for all inaccurate statements of the witnesses, I am convinced by the evidence, and find the facts to be as follows: On the 1st day of November, 1899, the steamer Ernest A. Hamill was towing a large scow, owned by the Pacific American Fish Company, from Bush Point, on

the western side of Whidby Island, through Bellingham channel, to a fishing station of the company on the northwesterly shore of Eliza Island; the distance between the two points being about 40 miles. The steamer and tow started from Bush Point about 3 o'clock p. m., and arrived at Eliza Island, where the collision occurred, at about 11:15 p. m. At about 9 p. m. the steamer Beaver, coming around Green Point and entering Bellingham channel, saw the lights of a steamer ahead, and followed in her wake until just before the collision occurred. At that time the Hamill, which was in fact the steamer showing her lights to the Beaver, was making an average speed, with her tow, of about 5 miles per hour, the Beaver was going at the rate of 9 miles per hour, and the Hamill was about 5 miles in advance. The distance from Green Point to Eliza Island is approximately 18 miles. The Hamill carried all the lights required by law,—that is to say, besides her green and red lights she carried two white lights on her mast forward, and one white light above her stern; but there was no light on the scow, which was being towed astern by a hawser 230 feet in length. The scow was built in compartments, designed to be filled with water, for the purpose of carrying fish alive, and was at the time partly filled with water, and settled so deep as to be invisible at night, and cranky as such a vessel would be if water-logged. Lights were not placed on her, for the reason that the captain of the Hamill deemed it useless. He seems to have expected her to capsize. The captain and others on board the Beaver did not observe the two masthead lights on the Hamill, and did not see the scow, and did not know that anything was being towed by the vessel ahead of them, until she came within dangerous proximity immediately before the collision happened. When the Hamill came to a point nearly opposite to her landing place, and distant one mile, or a little less, therefrom, with the Beaver less than one-fourth of a mile astern, and on a course which would have taken her a safe distance on the starboard side of the Hamill if she had continued on the course she was then steering, she (the Hamill) blew her whistle to indicate that she was coming to the landing, and at the same time swung to starboard, thereby changing her course so as to run across the bow of the Beaver with her tow following, so that a collision was inevitable unless the Beaver stopped or turned to port with great promptness, and passed the scow on her starboard side. In other words, to avoid a collision it was necessary for the Beaver to stop or come around quickly to a course at right angles with the course she was then steering, and pass the stern of the scow. Immediately after changing her course, the Hamill signaled to the Beaver, giving two short blasts of her whistle, which was intended to indicate that the Beaver should pass astern of her, and was so understood on board the Beaver; and a response was given of two blasts of the Beaver's whistle indicating that the Beaver would pass on the starboard hand, and go astern of the Hamill. As the Beaver did not immediately change her course, the Hamill gave three short blasts of her whistle, which was intended to warn the Beaver of danger, and to require her to stop, and this warning was repeated immediately. Within a minute, or a very short time, the scow was discovered by those on board

the Beaver, and the signal was given to the engineer to stop, which he did; but the engine was not reversed, and her headway was not checked in time to prevent a collision. The forward starboard corner of the scow struck the bow of the Beaver on her port side, crushing the side of the vessel so that she soon filled and sank.

The case seems to me to be very simple, for beyond all question the Hamill was in fault for towing a water-logged scow, without any light, in the path of other vessels, at night. The only excuse which the master of the towing vessel is able to offer for his failure in this regard is that the scow showed a disposition to capsize when he was going with her at a high rate of speed, and that he could not keep a light on the scow, because she was liable to capsize, and he would thereby lose it. It would be just as reasonable for any vessel to go to sea without a chronometer or compass, or adequate supplies for the voyage, on the ground that in case the vessel should be wrecked these things would be lost. The crankiness of the tow cannot be admitted as an excuse for dragging it at night where it would necessarily endanger the property and lives of other people. I consider that the Hamill also committed a fault in swinging to starboard, and attempting to cross the bow of the Beaver, under the circumstances described, without having first required the Beaver to stop or change her position so as to keep out of the way. The proctors for the claimant in their argument invoked the rule that when one vessel is following another the overtaking vessel must keep out of the way. This rule, however, is not applicable to vessels on crossing courses. After the Hamill changed her course, the Beaver was not following her. In view of the situation of the vessels at the time, with a tow astern which was invisible, the Hamill also gave an erroneous signal when she blew two blasts of her whistle. By this she plainly informed the Beaver that it was not necessary to stop or execute any unusual manœuvre in passing, or do anything more than change her course sufficiently to pass on her starboard hand; that is, pass the Hamill, not some other obstruction more than 200 feet away from the Hamill. The danger signal should have been given, instead of the signal to pass to starboard.

The Beaver was also in fault. If her pilot had been attentive to his duties, he should not have failed to observe the two white lights on the mast of the Hamill when she changed her course to run for her landing; and, seeing those lights, he should have known that there was danger in his path, to be avoided by stopping entirely, or changing his course so as to keep a wide margin of space between his vessel and the object in his way. In his testimony the captain of the Beaver admits hearing the three blasts of the Hamill's whistle, and a repetition of the same signal before he came near enough to the scow to see it, and that he did not give heed to that warning, nor stop his engine until he discovered the scow. He attempts to excuse this neglect by saying that he did not suppose that three blasts were intended as a signal to him, and did not understand what was meant. He did not regard three blasts as a warning, because he understands that a warning signal must be not less than four blasts. The excuse is a complete failure; for, as a matter of fact, the three blasts were repeated so quickly as to be in reality a warning consisting of six

blasts, and was a proper·warning, within the latest rules promulgated. Any intelligent person, if not reckless or rattled, would have known that it was unsafe to go ahead at the rate of nine miles per hour in the direction of another vessel when she was blowing her whistle in a manner to indicate something which he did not understand. When the scow was discovered, the captain of the Beaver rang the bells to stop the engine, but did not give the signal to reverse, and the only reason assigned for this failure is that he did not have time to do so before the collision occurred. ·This admission strongly supports the contention of the respondent that the captain of the Beaver was asleep when the Hamill changed her course, and that he was not aroused in time to maneuver his vessel so as to keep her out of danger, and that Mr. Hix, the owner, had command while the captain was asleep. This theory is based upon the testimony of a disinterested witness to the effect that the captain explained the accident to him by saying that he was· asleep, and that Hix was in charge of the vessel when the trouble began. It is admitted that Hix was not licensed or competent to have charge of the navigation of a steam vessel, and, if he assumed such responsibility, the resulting disaster is only what should have been expected. I have no difficulty in finding from the evidence that whoever had command of the Beaver failed to discover the two white lights on the mast of the Hamill, and failed to promptly change the course of the Beaver so as to give a sufficient margin of distance in passing the Hamill after assenting to her signal to pass on the starboard hand, and failed to stop and reverse the engine promptly in response to the danger signal given by·the Hamill. These failures are all inexcusable, under the circumstances, and were contributing causes of the accident. In my judgment, both steamers were equally in fault, and the case is a proper one for a division of the damages.

The libelants claim as damages the full value of the Beaver, assuming that she became a total loss, but their contention in this respect is unjust. The Beaver was not stranded on a desolate coast far away from her home port. On the contrary, she was beached within a safe harbor. Her boiler and engines were valuable, and were not injured. Appliances and facilities for raising and repairing her hull were near at hand, and easily obtainable. The evidence is convincing that the reasonable cost of saving and repairing the vessel, and demurrage for the time lost, would not amount to 50 per cent. of her actual value in the condition in which she was immediately after the accident. In view of all the facts, the damages which may be lawfully claimed include only the necessary cost of repairs and demurrage. The Baltimore, 8 Wall. 378, 19 L. Ed. 463; The Falcon, 19 Wall. 75, 22 L. Ed. 98. Before fixing the amount of damages, I will allow the libelants to introduce further proof as to the. expenses necessary for raising and repairing the Beaver, and the number of days necessary for doing that work if her owners had proceeded with diligence to restore her to service, if they elect to do so at their own expense. It is right to impose terms in granting this privilege, because the libelants have already made considerable expense in the taking of evidence in support of their claim to damages equal to the entire value of the vessel. I will therefore require them to stand the entire expense of taking additional evidence.