THE PHILADELPHIA.

(District Court, E. D. Pennsylvania.   August 27, 1912.)

No. 18.

1. COLLISION (§ 16*)—CONSTRUCTION OF RULES—"RISK OF COLLISION."

The term "risk of collision," as used in the Inland Rules (Act June 7, 1897, c. 5, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2875]), has a different meaning from the term "immediate danger," as used in article 27, and means "chance," "peril," "hazard," or "danger of collision"; and there is risk of collision whenever it is not clearly safe to go on.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 15; Dec. Dig. § 16.*

For other definitions, see Words and Phrases, vol. 7, p. 6246.]

2. COLLISION (§ 61*)—STEAM AND SAILING VESSELS—DISOBEDIENCE OF RULES—"RISK OF COLLISION."

A collision occurred in the Delaware river, in the daytime, between a schooner passing down, and at the time crossing to, the New Jersey side on a tack and a scow alongside of a tug passing up near the Jersey shore. The vessels were within sight of each other for a considerable time, and the schooner kept her course until within 150 feet, when, to avoid running into the tug, her helm was starboarded, and she attempted to cross the tug's bows, but was struck by the scow. The tug kept her course and speed. *Held*, that the fault was solely that of the tug, the courses of the two vessels being such as to "involve risk of collision," within the meaning of article 20 of the Inland Rules (Act June 7, 1897, c. 5, 30 Stat. 96 [U. S. Comp. St. 1901, p. 2883]), and to require the tug to keep out of the way, which she could have readily done by going to port, stopping, or reversing; that the change of course of the schooner was in extremis, and, if an error of judgment, was excusable.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 78; Dec. Dig. § 61.*]

In Admiralty.  Suit for collision by L. Furman Smith and others, as owners of the schooner Eugene Cathrall, against the steam tug Philadelphia.  Decree for libelants.

Willard M. Harris, of Philadelphia, Pa., for libelants.

Howard M. Long, of Philadelphia, Pa., for respondent.

THOMPSON, District Judge.  The owners of the schooner Eugene Cathrall filed a libel against the steam tug Philadelphia to recover damages arising from a collision between the schooner and the steam tug, alleged to have been caused by the negligence of those navigating the steam tug.  The undisputed facts established by the pleadings and testimony are as follows:

On October 28, 1910, in the daytime, the schooner Eugene Cathrall, being light, with the mate, Max Nagel, at the wheel, while beating down the Delaware river on a voyage from Philadelphia to Cape May, was on her starboard tack crossing the river from League Island, Pa., towards the Sanitarium in New Jersey; the wind being N. W. or W. N. W. and blowing a good breeze, the weather fair, the tide ebb, the schooner proceeding at a speed of about seven miles an hour under single reef mainsail, foresail, and jib.  At the same time the steam tug Philadelphia was a short distance below the Sanitarium, coming up the river with a loaded mud scow lashed to her starboard

side, which was laden with mud dredged from the mouth of the Schuylkill river, and being carried to a dump at Eagles Point, about one-half mile above the Sanitarium wharf. The tug and scow were proceeding up the New Jersey side of the river at a speed of about two miles per hour upon a course as close to the New Jersey side of the channel as they could safely navigate by reason of the shoals towards that shore; the tug's course being about E. S. E., and the master of the tug, Charles E. Rickards, at the wheel. The schooner was 90 feet in length, drawing 4 feet of water. The tug was 60 feet in length; and the scow she was towing was 80 feet in length and 30 feet beam, and was drawing about 10 or 10½ feet of water. The mate of the schooner, Nagel, had been going to sea since he was 14 years of age, and had been employed by L. Furman Smith, master of the schooner, for 19 years, and had sailed between Philadelphia and Cape May off and on for 10 or 12 years. A deck hand, a boy of 16, was also on deck. The master of the schooner was below. Rickards, the master of the tug, had been master of steamboats for 29 years, and held a license as second-class river and bay pilot for that time. There was no person besides Rickards on the deck of the tug. While on the starboard tack headed for the Sanitarium wharf, and about one-third of his way across the river, Nagel saw the tug about three or four points on his starboard bow, and when halfway across she was four or five points on his starboard bow. The master of the tug saw the schooner beating down the river when he was three miles away. As he proceeded up the river, when the schooner was on her last tack, he observed her two points on his port bow heading for the Sanitarium wharf. The courses of the vessels crossed; the tug kept her course and speed, and gave no signal to the schooner. The schooner kept her course and speed until she was within about 150 feet of the tug, when the mate of the schooner, fearing a collision, put his wheel hard to starboard, which threw the schooner about four points further to port. The schooner was carried directly in front of the tug, and the port bow of the scow, which extended about 10 feet forward of the tug's bow, struck the starboard bow of the schooner a glancing blow, which drove a hole in the schooner and caused her to sink. The collision occurred about 1:45 p. m. Those on board the schooner were taken off by a launch and landed on the Sanitarium wharf. The master of the tug took his scow to the dump, came back to the wharf, and took the master, mate, and deck hand of the schooner aboard his boat, where he took care of them overnight. That day about 5 p. m. a paper was prepared by the master of the tug and taken to one Hovenden Smith, a government steamboat inspector, who rewrote it. The master of the schooner signed it, and the next morning went with the owners of the tug before a notary public and made affidavit to it. The same morning the paper was signed by Nagel, the mate of the schooner. The paper is as follows:

"Between League Island & Sanitarium Wharf.

"Friday, Oct. 28, 1910.

"I, Captain L. F. Smith of the schooner E. H. Cathrell do hereby exonerate C. S. Rickards master of the tug Philadelphia from all blame and responsi-

bility in the matter and cause of the collision between the aforesaid named vessels in the Delaware river occurring at 1:45 p. m. this day between the points named on the top of this communication.          L. F. Smith.

"M. Nagel, Mate.

"Witness: Hovenden Smith.

"Sworn and subscribed before me this 28th day of October, 1910.

"Jos. H. Livezly, Notary Public.

"[Seal.]  Commission expires end of Senate, 1911."

The question as to the fault which caused the collision is dependent upon the testimony of the mate of the schooner, Nagel, who was the only witness to the collision on the part of the libelants, and that of the master of the tug Rickards, who was the only witness to the collision on the part of the respondent, and upon the effect of the paper referred to. The paper purports to "exonerate C. S. Rickards master of the tug Philadelphia from all blame and responsibility in the matter and cause of the collision between the aforesaid named vessels." It was signed by Smith after hearing Rickards' account of the collision; and his explanation of the cause which induced him to sign it is that Rickards asked him to do so, in order to avoid losing his pilot's license, and agreed to help him out with the expense incurred by the collision. Rickards testified that he did not make any promise as to helping with the expense of the collision, but that Smith asked him if the American Dredging Company would help out, and he replied that he did not know. Rickards obtained the paper for the purpose of using it in an expected investigation before the board of steamboat inspectors. It was intended to be used by the owner of the tug to escape liability in case of litigation; and it is apparent that the question of expense of the collision was discussed between Smith and Rickards. From the time Smith went on board the tug until the paper was signed, he was constantly in the company of Rickards, and was willing to sign the paper upon the statements made to him by Rickards as to the cause of the collision. As an admission of the circumstances attending the collision, it has, in my opinion, but little weight, as Smith was not a witness to the collision; and there is nothing to show that he had learned the circumstances from Nagel, his mate, at the time he signed the paper, except that when he went on deck after the collision Nagel said, "He pushed a scow into us when he ought to have went astern of us." Smith was not present when Nagel signed the paper, and Nagel was induced to do so because Smith had already signed it. The circumstances of the collision are clearly shown by an analysis of the testimony of Nagel and Rickards, which are not in substantial conflict as to the relative courses and positions of the two vessels, nor as to the cause of the collision. For these reasons, I do not consider the paper of sufficient weight to overcome the testimony of the witnesses.

The steering and sailing rules contained in the act to adopt regulations for preventing collisions, applicable to the case, are as follows:

"Steering and Sailing Rules.

"Preliminary—Risk of Collision.

"Risk of collision can, when circumstances permit, be ascertained by carefully watching the compass bearing of an approaching vessel. If the bearing does not appreciably change, such risk should be deemed to exist."

"Art. 20. When a steam vessel and a sailing vessel are proceeding in such directions as to involve risk of collision, the steam vessel shall keep out of the way of the sailing vessel.

"Art. 21. Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed.

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other.

"Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

"Art. 27. In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

The primary fact to be ascertained from the evidence is whether the tug and schooner were proceeding in such direction as to involve risk of collision.

[1] The expression "risk of collision" has a different meaning from the expression "immediate danger," as used in the twenty-seventh article. "Risk of collision" means "chance," "peril," "hazard," or "danger of collision" merely, and not immediate danger. The D. S. Gregory and The George Washington, Fed. Cas. No. 4,100. "Risk of collision" means, not merely certainty of collision, if no efforts be made to avert it, but danger of collision; and there is danger or risk of collision whenever it is not clearly safe to go on. The Aurania and the Republic (D. C.) 29 Fed. 98, 123.

In the case of The Milwaukee, Fed. Cas. No. 9,626, it is said:

"Risk of collision begins the very moment when the two vessels have approached so near each other, and upon such courses, that, by departure from the rules of navigation, whether from want of good seamanship, accident, mistake, misapprehension of signals, or otherwise, a collision might be brought about. It is true that prima facie each man has a right to assume that the other will obey the law. But this does not justify either in shutting his eyes to what the other may actually do, or in omitting to do what he can to avoid an accident made imminent by the acts of the other. I say the right above spoken of is prima facie merely, because it is well known that departure from the law not only may, but does, take place, and often. Risk of collision may be said to begin the moment the two vessels have approached each other so near that a collision might be brought about by any such departure, and continues up to the moment when they have so far progressed that no such result can ensue."

[2] If the testimony of Nagel is to be relied upon, the Cathrall, had she kept on her course, would have struck the Philadelphia amidships. He testified that when about one-third of the way across the river on his tack he had the tug three or four points on his starboard bow, and when halfway across had her four or five points on his starboard bow; that he expected the tug to stop, or to keep out of the way by starboarding her wheel and going to port, passing to the schooner's starboard side under her stern. As the deck hand of the schooner was not produced as a witness, and no one else besides Nagel saw the bearing of the vessels from the schooner, there is no direct evidence, either in contradiction or corroboration, of Nagel's testimony on this point from any witness on the part of the libelants. Rickards, the master of the tug, whose

testimony upon the bearing of the schooner from the tug is also
not corroborated or contradicted by direct evidence, testified that,
as the schooner was approaching his vessel crossing the river, she
was two points on his port bow, and it is evident from his testi-
mony that this bearing did not change as the vessels approached.
He testified that the schooner was pointing aft of his vessel, and
would have passed under her stern if she had kept upon her
course; that she would have had a clearance of not more than 50
feet.  The relative courses of the vessels and their relative posi-
tions at the time of the collision indicate that the schooner would
probably not have cleared the tug by going astern of her if she
had kept upon her course.  The schooner was 90 feet in length,
and therefore was but little over a boat's length from the tug and
scow when the wheel was put hard starboard.  If, as Rickards tes-
tified, she was upon a course that would have passed under the
stern of the tug, and upon starboarding her wheel she went off
six points to port, it is improbable that she would in that short
space have cleared the bow of the tug and struck the port bow
of the scow.  That the blow was a glancing one indicates that she
nearly cleared the scow.  In any event, the space by which Rick-
ards testified the schooner would have passed him if she kept upon
her course was, taking into consideration the bearing of the ves-
sels, close enough to involve risk of collision.  A slight error of
judgment or a sudden change of wind would, in all probability,
have diverted the course of the schooner sufficiently to bear her
against the tug or scow.  Under these circumstances, I find that
the vessels were so proceeding as to involve risk of collision; and
it was the duty of the tug to keep out of the way of the sailing
vessel, and to avoid crossing ahead of her, as her master was at-
tempting to do.  The Fannie, 11 Wall. 238, 20 L. Ed. 114.

There was nothing to prevent the tug from stopping or revers-
ing, as she had a headway of but two miles an hour, and the tide
was against her.  There was no approaching vessel which would
have interfered with her going to port further out into the stream;
and the only excuse her master offers for not changing his course
to port was that he wanted to keep out of the way of commerce,
and that, while there was no vessel in sight which would have in-
terfered with his so doing, he thought there was apt to be.  The
only resource which he appears to have considered open to him
was keeping further in towards the New Jersey shore, which he did
not wish to do, as he might run aground, or would not have suffi-
cient steerageway in shallower water.

The schooner had the right of way, and her mate had a right to
rely upon the tug obeying the rules, and either stopping, reversing,
or turning to port and passing under his stern, and thereby keep-
ing out of his way.  The tug was not in such a position of em-
barrassment as to permit an exception to the rules.  The Mar-
guerite (D. C.) 87 Fed. 953; The Oregon, 18 How. 570, 15 L. Ed.
515; Belden v. Chase, 150 U. S. 674, 14 Sup. Ct. 264, 37 L. Ed.
1218; Excelsior v. The Bruce (D. C.) 38 Fed. 271.

I cannot find that the schooner is in fault in the maneuver which she executed. She was sailing close to the wind; and, taking the view of her course which is derived from the testimony of the mate of the schooner and of the master of the tug, I am not convinced that the porting of her helm, thereby throwing her closer to the wind, or putting the helm hard down to port and attempting to go about, would not have carried her directly against the tug and scow.

It was the plain duty of the tug to keep out of the way of the schooner and to avoid crossing her bows; and the position in which the schooner was placed was through the fault of the tug in not stopping, reversing, or passing astern of the schooner by going to port. The maneuver was executed by the schooner when she was so close to the tug that there was immediate danger of collision if she kept her course and speed; and, under those conditions, if the mate made an error in judgment, it was excusable. Excelsior v. The Bruce (D. C.) 38 Fed. 271; The Sea Gull, 23 Wall. 165, 23 L. Ed. 90; The Falcon, 19 Wall. 75, 22 L. Ed. 98; The City of New York, 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84.

There was some evidence by witnesses on the part of the respondent of admissions made by the master of the schooner that the mate, Nagel, was drunk when at the wheel at the time of the collision; but there was not sufficient evidence to show that he was in that condition, nor that it interfered in any manner with his handling the schooner. If he had been drunk, it could readily have been discovered when he came off the schooner; and, as no witness was called who observed 'that he was drunk at that time, the evidence upon this point must be disregarded.

My opinion is that the tug Philadelphia was solely in fault; and it is therefore ordered that a decree be entered in favor of the libelants, with costs. A commissioner will be appointed to assess the libelants' damages.