THEDE et al. v. ALASKA S. S. CO.

(Third Division.   Valdez.   October 21, 1914.)

No. S/44.

1. COLLISION ⊜⇒68—VESSELS MOORED.
    The steamship Dora was insecurely moored to the dock at
    Seward.  During the night a storm arose and broke her loose.
    She swung on shore, striking the plaintiffs' launch, which was
    safely anchored between her and shore, sinking the launch in
    the shallow water next to the shore.  *Held*, the defendant is
    liable, by reason of its neglect in not properly mooring the
    steamship, for the damage sustained by the plaintiffs in the
    sinking and throwing on shore of the launch.

2. COLLISION ⊜⇒133—DAMAGES—MITIGATION.
    Where by collision with another boat a vessel is sunk in shal-
    low water, it is the duty of the owner of the sunken vessel to
    make reasonable exertion to save the boat and prevent a total
    loss.  The owner is bound to raise and repair.  The increased
    injury after the lapse of a reasonable time to raise and repair is
    not the proximate result of the collision, but of the owner's neg-
    lect to perform his duty to raise and repair, and he must bear
    that loss.

This is a common-law action for damages done to plain-
tiffs' gasoline launch Uncle Sam by the steamship Dora, owned
by the defendant, in the port of Seward, in December, 1912.

From the pleadings and the evidence it appears that the
plaintiffs' launch was moored safely and securely in a prop-
er place, under the lee of the public dock or wharf at Sew-
ard; that on the evening of December 6th the steamship
Dora came to said dock and was moored by lines fastened
thereto; that during the night a storm arose; that the stern
lines of the Dora parted, and she was blown around and into
the launch, breaking her loose from her moorings, so that she
went upon the beach.  The steamship Dora also finally went
upon the beach from the effects of said storm.

The testimony of the plaintiffs shows that there were four
lines from said steamship Dora, fastening her to the dock;
that the stern line was a four-inch cable, and the two bow lines
were 7½-inch cable; that the plaintiff Thede, who is wharf-
inger at said dock, when the steamship Dora was mooring,
requested the first mate, Hoffman, to put on a heavier stern

⊜⇒See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

line, as said four-inch line was not sufficient, heavy winds being liable to come up at that season of the year; that said mate, Hoffman, replied that it would be time enough to do it the next day. The said mate, Hoffman, was not present as a witness, but, for the purpose of securing time in which to take his deposition, defendant made an affidavit, setting out the materiality of his testimony, and that he, if present, would testify, denying said statements claimed to have been made to him by the plaintiff Thede. The plaintiffs, in order to avoid said postponement, admitted that said Hoffman, if present, would so testify.

The testimony as to the size of the cables fastening the steamer Dora is practically undisputed by the defendant, except that defendant's witnesses testified that the two stern lines were four and five inch lines, respectively, and that there were five lines out altogether.

The testimony is conflicting as to the condition of the weather outside the port of Seward on said date.

Harold N. Nuzum, of Los Angeles, Cal., for plaintiffs.
R. E. Capers, of Cordova, for defendant.


BROWN, District Judge. I feel satisfied from the testimony that said steamer Dora was not safely nor properly moored, in view of the winds, which the testimony shows were liable to occur at that season of the year. The rule is that, where there is a collision between a vessel anchored or at rest upon the waters and a moving vessel, the burden of proof is upon the one moving to show that it was free from fault, and it must repel the presumption of its negligence or suffer the damages incurred. The Lucille (D. C.) 169 Fed. 719.

I believe the testimony shows that the plaintiff established actual negligence on the part of the defendant, irrespective of this rule.

The defendant in its brief contends that there is no testimony that the steamship Dora actually struck or was the cause of the breaking loose of the launch Uncle Sam. The testimony, however, of one of the sailors, Charles Johnson, who was on the Dora, shows that the Dora did strike the Uncle Sam and broke the mast out of it.

The testimony of plaintiffs' witnesses shows that plaintiff Thede bought the hull of the Uncle Sam for $100, the same having laid on the beach a long time, and being an old hull; that a shipbuilder, one Melchior, testified that the hull was sound; that he put in $500 or $600 worth of labor on it; and the plaintiffs testify that they had two or three other men working on it, and put in labor and material to the value of $1,100 or $1,200. Melchior also testified that the hull was sound and in good condition, and the launch was worth from $5,000 to $6,000. Plaintiffs sue for $3,500, alleging that to be the value of the launch.

There is no testimony on the part of the plaintiffs showing what it would have cost to have said launch repaired. She was not altogether under water, but was on the beach, and the witness Hoben, who is in the transfer business at Seward, testified that he could have hauled her out on shore, where she could have been repaired, for $50. This is not contradicted by plaintiffs. The testimony of the defendant's witnesses shows that she could have been repaired for $500 or $600.

The plaintiffs seem to have proceeded upon the mistaken theory that they had nothing to do with the launch after the accident, but that they might abandon it, and that it was the duty of the defendant company to take charge of it. In other words, the plaintiffs supposed, or were advised, that they could recover the full value of the launch from the defendant company, and they therefore paid no further attention to it, made no effort whatever to care for or protect it, and it still lies upon the beach near the dock at Seward.

Plaintiffs' testimony shows that they took the engine out of the launch, and no damage is shown to have been done it.

At the request of counsel in the case I inspected this hull from the wharf, where it could be plainly seen, as it lies immediately below the approach to the dock. I am satisfied that even now the launch could be put in as good repair as it was at the time of the accident for little more than $500 or $600. Any deterioration or loss occurring since that time is plaintiffs' loss, as it was their duty to have taken charge of and repaired the launch, and not abandon it.

"The Supreme Court, in the case of The Baltimore, 8 Wall. 377, 386–388 [19 L. Ed. 463], held explicitly that, under circumstances analogous to the present, where the vessel was sunk, not at sea, but in a river, and in comparatively shallow water, it was the duty of

the libelant to make reasonable exertion to save the boat, and to prevent a total loss. If I were at liberty to disregard the rule there laid down, I should not feel disposed to do so, since the obligation there stated seems to me one of evident justice. The cases cited by the libelant (The Falcon, 19 Wall. 75 [22 L. Ed. 98]; The Columbus, 3 Wm. Rob. 161) have no reference to vessels that are sunk in shallow water, and can be raised at slight expense, but only to vessels sunk in deep water, or under other circumstances that afford no reasonable ground to believe that the vessel is worth raising and repairing. Such is not this case. The yacht was worth much more than the cost of raising and repairing. The libelant had no reason to suppose the contrary. He was therefore bound to raise and repair. I see no reason for relieving him from the loss that arose from his failure to discharge that obligation, and for imposing that loss upon the respondents; certainly none in this case, where the referee has found that his neglect to raise the boat was intentional, and was designed to compel the respondents to pay for a total loss, when the injury, and the circumstances of the sunken boat, were not such as legally bound them to do so. The increased injury that happened to the yacht after the lapse of a reasonable time to raise her was not the proximate result of the collision, but of the libelant's neglect to perform his own subsequent duty to raise her, and he must bear that loss." The Thomas P. Way (D. C.) 28 Fed. 526; 7 Cyc. p. 391.

This is one of that class of cases where a great deal of ill feeling grows up as against a corporation, by reason of the mistaken idea of claimants in demanding an excessive or exaggerated amount of damages. It is a case where both sides could probably have agreed upon the amount of the damage, had it been gone at in a proper spirit. The fact that many people, who sustain some injury by reason of the acts of large corporations in operating transportation either on sea or land, make excessive demands for damages, has no doubt caused corporations to resent and resist these demands, and accounts for a great deal of the trouble that has arisen from such matters, and the growth of public feeling against corporations; whereas, if such demands were made moderate and within reason, adjustments might more easily be made.

I find that the defendant is liable, by reason of its neglect in not properly mooring the steamship Dora, for the damage sustained by plaintiffs to the launch Uncle Sam, and said damage is allowed in the sum of $600, being $500 for the repairs to the boat, $50 for hauling it up above high-water mark, and $50 for placing it back in the water.

Findings and judgment may be prepared accordingly.