**WILLIAMSON LEASING COMPANY, INC., et al.,**

v.

**AMERICAN COMMERCIAL LINES, INC., et al.,**

**Civ. A. No. 83–678 "I" (2).**

United States District Court, E.D. Louisiana.

Aug. 26, 1985.

I. Matthew Williamson, O'Neil, Eichin & Miller, New Orleans, La., for plaintiffs.

Fred E. Salley, New Orleans, La., for defendants.

## OPINION

MENTZ, District Judge.

### I. JURISDICTION

A bench trial of this matter was conducted by the Court on March 7–8, 1985. Jurisdiction was based on 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure and was uncontested.

### II. BACKGROUND

■ The following uncontested facts serve as a description of the parties and vessels: On February 16, 1982 the M/V JACK D. WOFFORD and tow collided with the stern of the M/V SHELLY MOTT (presently the M/V SNOW SHEEN), a vessel moored at Mile 55 of the Illinois River. At that time, plaintiff, Williamson Leasing Company, Inc. was the owner of the M/V SHELLY MOTT and plaintiff, American Barge Company, Inc., was the bareboat charterer of that vessel. Williamson Leasing Company, Inc. and American Barge Company, Inc. were subsidiaries of plaintiff TPC Transportation Company, Inc. On January 31, 1983, Williamson Leasing Company, Inc. and American Barge Company, Inc. were merged into TPC Transportation Company, Inc., at which time Williamson Leasing Company, Inc. and American Barge Company, Inc. ceased to exist as distinct and separate entities. Also at that time, TPC Transportation Company, Inc. assumed all the liabilities and acquired all of the assets of the dissolved companies. Accordingly TPC Transportation Company, Inc. is the proper party to assert this action for damages to the M/V SHELLY MOTT.

At all material times, defendants American Commercial Lines, Inc., American Commercial Barge Line Company, and Inland Tugs Co. were, and still are, corporations duly organized and existing under laws of states other than Louisiana. The M/V JACK D. WOFFORD and Barge ACBL–2934 were owned by American Commercial Lines, Inc. On February 16, 1982, the M/V JACK D. WOFFORD was chartered to and operated by Inland Tugs Co., and the Barge ACBL–2934 was bareboat chartered to American Commercial Barge Line Company.

The M/V SHELLY MOTT is a river towboat built in 1974 by Mainstream Shipyards of Greenville, Mississippi, measuring 140 feet long and 35 feet wide, and powered by two diesel engines generating approximate-

ly 3,800 horse power. The M/V JACK D. WOFFORD is a river towboat built in 1976 by Jeffboat of Jeffersonville, Indiana, measuring 170 feet by 40 feet and equipped with two diesel engines generating approximately 5,000 horsepower.

## III. FINDINGS OF FACT

### (1)

On February 15, 1982, the M/V SHELLY MOTT picked up eight empty barges at Mile 34 on the Illinois River at approximately 1500 hours and proceeded northbound. The vessel and tow arrived at Florence Fleet at Mile 55 on the Illinois River at 2320 hours (11:20 P.M.) on February 15, 1982. The M/V SHELLY MOTT's eight barge tow was arranged two wide and four long, making the flotilla approximately 940 to 950 feet long.

### (2)

In the area of Mile 55 the Illinois river is between 800 and 900 feet wide. Its navigable channel, located approximately mid-river, is normally about 300 to 400 feet wide during warm weather. However, the cold weather conditions existant on February 15, 1982 resulted in an "ice channel" near the center of the river. This condition is caused when relatively hard, packed ice forms near the banks of the river and extends toward midstream. An ice channel then forms in the center of the river as a result of the effect of tows travelling in midstream and breaking up the ice. In accordance with bipartisan testimony, the Court finds that an ice channel condition existed on February 15–16, 1982.

### (3)

Plaintiff's witness Capt. John Griffith, a river boat pilot[1] who holds a first class license and has passed Mile 55 many times

in winter, testified that the ice channel is normally 70—80 feet wide and restricts tows' width to a maximum of two barges wide. "Cube ice" drifts in this channel as a result of the passage of other vessels. These conditions prevailed at the time of the collision.

### (4)

At the time the M/V SHELLY MOTT arrived at Florence Fleet, Captain John Griffith was at the wheel. Captain Griffith moored the vessel and her tow in the fleet by securing the starboard bow corner of the M/V SHELLY MOTT's tow to a group of barges moored to the left ascending bank. The vessel was moored so that the head of its tow was against the left ascending bank facing upstream and the stern of the M/V SHELLY MOTT was angled into the river. At this time the vessel was in excellent condition and Griffith experienced no problems with her.

### (5)

Based on testimony, the Court finds that the left ascending edge of the ice channel was about 350 to 400 feet from the left ascending bank.[2] The vessel and her tow were moored at an angle of 30–35° from the left ascending bank. This resulted in the stern of the vessel being about 460 feet from the left ascending bank.[3] The M/V SHELLY MOTT, its stern protruding into the ice channel, impaired the safe navigation of vessels traversing this area of the river.

### (6)

On February 16, 1982, Captain Griffith came on watch at approximately 0600 hours, and observed that the M/V SHELLY MOTT was moored in exactly the same position as when he went off watch at 2400

---

1. Griffith was the pilot aboard the M/V SHELLY MOTT at the time of the collision giving rise to this action.

2. Search lights were used when the vessel was moored during the night of February 15–16, 1982.

3. Griffith testified that, after mooring, the stern starboard corner of the vessel was 175 to 200 feet from the left ascending bank and 50–75 feet

out of the ice channel. This estimate is unconvincing because Griffith also said the ice channel, at the location where the vessel was moored, was 350 to 400 feet from the left ascending bank. A 940-foot flotilla moored at a 30° angle would have its stern 460 feet from the left ascending bank and in the ice channel. The relief pilot on this vessel, Charles Baughman, estimated that the M/V SHELLY MOTT was at an angle of 40–45° from the bank [see: Baughman deposition of January 12, 1984 at Page 19].

hours on the 15th. The ice conditions which existed on the river at the time prevented any significant movement of the vessel, its tow or the surrounding barges in the fleet. Just prior to this time, at approximately 0530, this witness saw a tow pass the position of the M/V SHELLY MOTT. This vessel was identified as the M/V BECKFJORD, an Ohio Barge Line vessel with an eight barge tow. This vessel passed within 40 to 50 feet of the MOTT's starboard stern.[4]

(7)

When Captain Griffith, went off watch around 11:30 A.M., heavy fog had reduced visibility to about 400 feet and the head of the MOTT's tow was not visible from the wheelhouse. At that time, Pilot Charles Baughman came on watch in the wheelhouse of the M/V SHELLY MOTT and remained there until the time of the collision at approximately 1217 hours.

(8)

On February 16, 1982 the M/V JACK D. WOFFORD was northbound on the Illinois River, pushing a tow of eight empty barges and two loaded barges,[5] including the Barge ACBL–2934 at the port lead. The weather was cold, the river was iced, and the M/V JACK D. WOFFORD was required to push ahead through the ice channel at approximately one to one and one-half miles per hour.

(9)

Captain Howard Evans of the M/V JACK D. WOFFORD worked the forward watch from 0600 hours to 1200 hours. As the deck log of the M/V JACK D. WOFFORD reflects, at 11:15 a.m. Captain Evans stopped the vessel at Mile 50 due to heavy fog.

(10)

At approximately 1200 hours on February 16, 1982, Pilot Paul Van Meter came on watch in the wheel house of the M/V JACK D. WOFFORD, and, despite the fact that restricted visibility and hazardous conditions[6] continued to prevail, resumed navigating the vessel and her tow in a northbound direction toward Mile 55.

(11)

As the M/V JACK D. WOFFORD approached Mile 55, she suddenly encountered the stern of M/V SHELLY MOTT which was protruding into the narrow ice channel and, was therefore, in the navigable right of way. The Barge ACBL–2934 which was the port lead barge in the tow of the M/V JACK D. WOFFORD, then rammed and rode up onto the stern and rudder house of the M/V SHELLY MOTT, causing the damage which forms the basis of this lawsuit.

(12)

At no time before the collision did Pilot Van Meter visually sight the M/V SHELLY MOTT, although just prior to the collision he observed an "elongated blip" on his radar which appeared to be dead ahead of the northbound M/V JACK D. WOFFORD. Despite the presence of this radar target,

4. This further convinces the Court that the stern of the MOTT was protruding into the ice channel [see Footnote 3]. If the BECKFJORD was in the ice channel, it had to be *at least* 400 feet from the left ascending bank. The MOTT, attached to the rear of its flotilla, could not have been within 200 feet of that bank.

5. The defense witness Ronald Lee Loughmiller, a dispatcher riding aboard the M/V JACK D. WOFFORD on February 16, 1982, testified that the WOFFORD's tow was made up of six empties and two loads and arranged 2 × 4 with the vessel "centered up" on the rear barges of the tow. The length of this flotilla was about 970 feet: 800 feet of tow and 170 feet of towboat.

6. On cross-examination, Loughmiller testified that fog prevented anyone in the pilothouse from seeing the head of the WOFFORD's tow or the ice channel ahead of the tow. He admitted he couldn't tell, from his place of observation, if the head of the WOFFORD's tow was even in the ice channel. Visibility was described as no more than three barge lengths [about 600 feet]. Loughmiller didn't see the M/V SHELLY MOTT prior to the collision and couldn't tell if she had lights on.

Charles Baughman, pilot of the M/V SHELLY MOTT, said visibility at the time of the collision was 400 to 600 feet [Baughman deposition of January 12, 1984, Page 36]. Ronald E. Robertson, engineer on the MOTT at the time of the collision, said visibility was 25 to 30 feet at the moment right after collision [Robertson deposition of February 22, 1985 at Page 47].

Pilot Van Meter made no effort to ascertain the nature of the blip and incautiously continued on his way, thereafter colliding with the stationary M/V SHELLY MOTT. This imprudence on Van Meter's part was a factor causing the collision.

(13)

The Court finds that the protrusion of the M/V SHELLY MOTT into the ice channel was a contributing cause of the collision.[7] While the M/V SHELLY MOTT did not completely block the ice channel, as evidenced by the passage of the M/V BECKFJORD at 0530 on February 16, 1985, this obstruction constituted a hazard which partly caused the collision. The failure of the WOFFORD to cease navigation in the dense fog created an additional hazard and was also a contributing cause of the collision.

(14)

The Court attributes 33⅓% of the fault to the stationary M/V SHELLY MOTT for reason of its improper mooring and 66⅔% of the fault to the M/V JACK D. WOFFORD, the moving vessel. 33⅓% of the fault is attributable to the WOFFORD because it should have remained stopped and waited for the fog to lift. An additional 33⅓% of the fault is also attributable to the WOFFORD because she was being navigated in a negligent fashion when the collision occurred.

(15)

After the collision, Mr. John Stickling, then employed by Marine Loss Control, Inc., was retained by TPC to conduct a preliminary damage survey of the M/V SHELLY MOTT.[8] He attended the vessel on the evening of February 16, 1982, while the vessel was still at Florence, Illinois. At that time, Mr. Stickling observed areas of damage, such as marks left by the lower bow towknees of the M/V JACK D. WOF-FORD's lead barge, which were recent in nature and consistent with the collision. He found impact damage to the stern rudder house and metal fractures of the starboard bow tow knee. Mr. Stickling also observed other minor damage to the vessel but concluded that such damage did not result from the casualty because its age was not recent. The Court finds his testimony convincing and adopts his determinations as to the readily apparent, "topside" damages the M/V SHELLY MOTT sustained in the collision.

(16)

Mr. Stickling again saw the M/V SHELLY MOTT on February 22, 1983 while she was at St. Louis Shipyard. He found that the starboard tailshaft cooper bearing was broken and that tailshaft realignment was required. In his opinion, the tailshaft misalignment caused the vibration which caused the cooper bearing failure. This misalignment was, in turn, caused by stress. When asked if ice passing through the propellers would cause such stress, Stickling opined that the drivetrain should be able to sustain the pressures of ice as the system was designed to absorb that stress. As there was no evidence of propeller damage or misalignment, Stickling concluded that the stress which induced tailshaft misalignment, leading to cooper bearing failure, was caused by the collision. Although defendant raised the possibility of pre-collision vibration, no convincing evidence was introduced at trial to establish that fact and the Court finds that plaintiff's evidence is sufficient for the Court to find that the collision caused both the drivetrain damage and the other structural damages to the M/V SHELLY MOTT.

(17)

Shortly after the 16th, the M/V SHELLY MOTT departed Florence for St. Louis, Mis-

---

7. Seconds before the collision, Pilot Baughman, who was maintaining his watch in the wheel house of the M/V SHELLY MOTT, noticed the head of the M/V JACK D. WOFFORD's tow emerging from the fog on a collision course with the M/V SHELLY MOTT. Baughman immediately tried to contact the M/V JACK D. WOFFORD on the radio to warn it of the im-

pending collision but, to no avail, the collision occurred.

8. Mr. Stickling is a St. Louis, Missouri-based marine surveyor with twelve years experience. He primarily used measurements to determine the extent of damage and inspected to see if the age of the damage agreed with the known time of the accident.

souri. While enroute, the starboard main engine would vibrate when used at full power. This vibration problem did not exist prior to the collision.[9] The Court finds that a cooper bearing mount which supported the starboard tail shaft had been broken and related, starboard engine alignment problems created when the bow of the M/V JACK D. WOFFORD's tow rode up on the stern of the M/V SHELLY MOTT.[10]

(18)

Considering the trial testimony, depositions and all available evidence, the Court concludes that the following items of damage to the M/V SHELLY MOTT[11] resulted from the February 16, 1982 collision: (Item numbers and repair costs are from the St. Louis Shipyard bill for repairs.)

a) Item No. 2: starboard side alignment; $750.00

b) Item No. 4: repair of the stern rudder house; $18,885.53

c) Item No. 7: starboard cooper bearing repairs; $2,627.16

d) Item No. 8: shore power; $153.00

e) Item No. 9: renew shims and realign starboard engine: $4,809.63

f) Item No. 10: weld starboard engine feet; $28.85

g) Item No. 12: renew · damage to starboard bow towknee (minus $2,285.00 which represents an improvement by installation of S.L.S. type rubber bumpers); $5,000.00

h) Item No. 15: blocking the vessel at drydock; $288.50

i) Item No. 16: docking and launching of the vessel at the drydock; $638.25

(19)

Damages to plaintiffs total $29,180.92. This figure is reduced one-third ($9,726.97) in proportion with the comparative percentage of fault attributable to the M/V SHELLY MOTT for reason of her improper mooring which partially obstructed the ice channel of the Illinois River at Mile 55.

## IV. CONCLUSIONS OF LAW

(1)

Jurisdiction of this Court is vested pursuant to 28 U.S.C. § 1332 and Rule 9(h) of the Federal Rules of Civil Procedure.

(2)

The M/V SHELLY MOTT violated Rule 9(g) of the Inland Navigational Rules, 33 U.S.C. § 2009(g), in that she was moored so as to protrude into a narrow channel. While 33 U.S.C. § 2009(g) provides: "Every vessel shall, if the circumstances of the case admit, avoid anchoring in a narrow channel," the overall size of a towboat and its tow, in addition to the physical conditions of the river, are all properly considered by the Court in determining whether to apply the Narrow Channel Rule. *Weathers Towing, Inc. v. M/V HERMAN POTT,* 570 F.2d 1294, 1295–96 (5th Cir.1978). The Court also looks to the

---

**9.** Captain John Griffith testified at trial that the vessel was in excellent condition prior to the collision. Afterward, he said a vibration was present when the vessel came ahead.

Chief Engineer Robertson also testified that the M/V SHELLY MOTT had no vibration problems at any time prior to tying off in Florence Fleet on the night of February 15, 1982. (See plaintiff's Exhibit 6, Robertson Deposition of February 22, 1985 at pg. 52.)

**10.** Ronald E. Robertson, Chief Engineer of the M/V SHELLY MOTT, testified at his deposition that hull stress might cause this damage. He believed that when the port head of the WOFFORD's tow rode up on the stern of the MOTT, the hull was pushed downward unevenly, creating a torque-like stress on her hull. This could

have caused the cooper bearing and alignment problems in the starboard power train and also caused damage to the starboard bow tow knee. While Mr. Robertson was not qualified as an expert witness, his opinion was the most plausible explanation of the damage offered to the Court. (See plaintiff Exhibit 6, Robertson Deposition of February 22, 1985, at pg. 72.) See F.R.E. 701 for the admissibility of a lay opinion.

**11.** See Plaintiff's Exhibit No. 5 for a complete list of all work performed on the MOTT at St. Louis Shipyard. Not all items on this list were occasioned by the collision; some were simply vessel improvements or routine maintenance actions accomplished contemporaneously with the collision repairs.

physical dimensions of the area and the character of the navigating use to which the water is put. *Tempest v. United States*, 277 F.Supp. 59, 63 (E.D.Va.1967), *affirmed*, 404 F.2d 870 (4th Cir.1968).

### (3)

■ The Court first considered the dimensions of the Illinois River at Mile 55 and its seasonal physical conditions. A channel 700 or 800-feet wide, nearly the width of the Illinois River at Mile 55, is a narrow channel. *The H.A. Baxter*, 182 F. 930, 932 (D.C.R.I.1908). A channel 300-feet wide, which is the normal, warm weather width of the navigable center of the Illinois River at Mile 55, is a narrow channel. *Barge Lake Farge Corp. v. The Saxon*, 183 F.Supp. 132, 135 (E.D.Pa.1960), *affirmed*, 286 F.2d 247 (3rd Cir.1961). A canal which is 250-feet wide at the point of collision, but only 150 feet of which is usable as a channel for vessels, is a narrow channel. *Lee v. Candies*, 216 F.Supp. 665, 666 (E.D.La. 1963), *affirmed*, 323 F.2d 363 (5th Cir. 1963). The Court is therefore of the opinion that the Illinois River at Mile 55, even when unfrozen, is a narrow channel, and therefore, is certainly a narrow channel in winter when vessels must navigate in a 70–80-foot wide ice channel.

### (4)

The Court next considered the dimensions of plaintiff's flotilla in relation to the width of the Illinois River at Mile 55. The MOTT's tow was 940-feet long and the Illinois River at Mile 55, from bank to bank, is an almost equal distance. These facts additionally require the Court to apply the Narrow Channel rule. *Weathers Towing, Inc., supra; Tempest, supra.*

### (5)

■ The M/V SHELLY MOTT violated the Rivers and Harbors Act, 33 U.S.C. § 409, in that she was moored in a fashion which resulted in a protrusion into a navigable channel in such a manner as to obstruct the passage of other vessels. *Orange Beach Water, Sewer and Fire Protection Authority v. M/V ALVA*, 680 F.2d 1374, 1379 (11th Cir.1982). 33 U.S.C. § 409 provides in pertinent part:

> "It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such manner as to prevent or obstruct the passage of other vessels or craft ..."[12]

Whether a mooring constitutes an obstruction to navigation is to be determined by reference to all the relevant facts and circumstances,[13] including the percentage of the waterway's width which is not obstructed. *Id.* at 1380. Here, the M/V SHELLY MOTT's flotilla extended 460 feet into the river from the left ascending bank. This was approximately 45—50% of the total width of the Illinois River at Mile 55, and caused partial obstruction of the 70—80-foot wide ice channel.[14]

---

**12.** The Court also notes that the duty to avoid creating an obstruction to navigation extends to the entire width of the navigable waterway, and is not limited to the channel. *United States v. Raven*, 500 F.2d 728, 732 (5th Cir.1974), *cert. denied*, 419 U.S. 1124, 95 S.Ct. 809, 42 L.Ed.2d 824 (1975).

**13.** 33 U.S.C. § 409 does not absolutely prohibit mooring of vessels in navigable channels, but is intended to prevent anchorage or moorage in a way which monopolizes the channel. There is no violation where sufficient passageway exists and other vessels can pass in safety when navigated with proper care. *Nehus v. Alaska Marine Towing, Inc.*, 519 F.Supp. 328, 332 (W.D.Wash. 1981). In this case, there is evidence that the M/V BECKFJORD did successfully pass the M/V SHELLY MOTT without colliding. However, the M/V JACK D. WOFFORD was not being navigated with proper care as demonstrated by her operation in dense fog and Pilot Van Meter's poor judgment regarding the "elongated radar target" which he later discovered was the M/V SHELLY MOTT. The M/V SHELLY MOTT's mooring did not monopolize the navigable channel, but it did intrude far enough to deny passageway to a vessel being navigated without due care under the existent fog conditions. For this reason, a violation of 33 U.S.C. § 409 is perceived by the Court.

**14.** If the ice channel was in the center of the Illinois River at Mile 55, where navigation charts place the sailing line, the left ascending edge of the ice channel would lie about 450 feet from the left ascending bank. Because her stern was at least 460 feet from the left ascending bank, the M/V SHELLY MOTT protruded into this channel.

(6)

■ The *Pennsylvania* Rule provides that when a ship violates a statutory rule of navigation intended to prevent collisions, "the burden rests on the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been." *The PENNSYLVANIA,* 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873). If one party carries this burden, the burden of proof as to causation is then shifted to its opponent by the rule. However, this shifted burden does not *ipso facto* impose liability. *Otto Candies, Inc. v. M/V MADELINE D,* 721 F.2d 1034, 1036 (5th Cir.1983); *Florida East Coast Railway Company v. Revilo Corporation,* 637 F.2d 1060 (5th Cir.1981). The *Pennsylvania* rule is applicable to plaintiffs for reason of the M/V SHELLY MOTT's violation of 33 U.S.C. § 409. Because plaintiffs were unable to show that the protrusion of the M/V SHELLY MOTT into the ice channel was not a cause of the collision, the burden of proof as to this factor in the collision does not shift to defendants.

(7)

■ The *Pennsylvania* Rule applies only to violations of a mandatory statute or regulation designed to prevent a collision. *State of Louisiana v. M/V TESTBANK,* 564 F.Supp. 729, 738 (E.D.La.1983); *Davis v. Superior Oil Co.,* 510 F.Supp. 1162, 1165 (E.D.La.1981); *Board of Commissioners of Port of New Orleans v. M/V AGELOS MICHAEL,* 1974 A.M.C. 1470, 1473 (E.D. La.1974).

(8)

■ The Inland Navigational Rules (33 U.S.C. § 2001 *et seq.* effective as of December 24, 1981) and common law principals of admiralty law require prudent seamanship and due care. Violations of the rules of navigation or default in the exercise of prudent seamanship constitute negligence and impose liability on the guilty party. *Miller v. Semet-Solvay Division, Allied Chemical Corp.,* 406 F.2d 1037, 1038 (4th Cir.1969); *Weathers Towing, Inc. v. M/V HERMAN POTT, supra.* In accordance with its findings of fact, the Court concludes that violations of the Inland Rules and imprudent seamanship form the basis of imposing liability on both parties.

(9)

■ A moving vessel which collides with a moored vessel is presumed to be at fault. *The Oregon,* 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895); *The Clarita,* 90 U.S. (23 Wall.) 1, 13, 23 L.Ed. 146 (1874). This presumption suffices to make a prima facie case of negligence. *Skidmore v. Grueninger,* 506 F.2d 716, 722 (5th Cir. 1975); *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.,* 377 F.2d 724, 726 (5th Cir.1967). This presumption of fault is applicable in the present case because the M/V SHELLY MOTT was moored and the M/V JACK D. WOFFORD was moving when she rammed the stern of the M/V SHELLY MOTT. The M/V JACK D. WOFFORD is therefore presumed negligent. Defendants were unable to rebut this presumption at trial and are found to be proportionately at fault for the collision.

(10)

Rule 7 of the Inland Navigational Rules, 33 U.S.C. § 2007, provides in pertinent part:

(a) Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

(b) Proper use shall be made of radar equipment if fitted and operational, including long-range scanning to obtain early warning of risk of collision and radar plotting or equivalent systematic observation of detected objects.

(c) Assumption shall not be made on the basis of scanty information, especially scanty radar information.

(d) In determining if risk of collision exists the following considerations shall be among those taken into account:

(i) such risk shall be deemed to exist if the compass bearing of an approaching

**1340**

vessel does not appreciably change; and

(ii) such risk may sometimes exist even when an appreciable bearing change is evident, particularly when approaching a very large vessel or a tow or when approaching a vessel at close range.

(11)

A vessel equipped with radar[15] is under a duty to use it intelligently and fully, and the master or pilot who fails to do so is heavily burdened to prove that such fault did not contribute to the collision. *Licenses of Parnell and English,* 1971 A.M.C. 2212, 2214 (U.S.C.G.1971). The failure of an operator of a vessel to detect, by radar, that a close quarters situation is developing and the subsequent failure to take early and substantial action to avoid such a situation is statutory fault. *Atlantic Richfield Co. v. S.S. STEEL DESIGNER (the ATLANTIC TRADER)* 1970 A.M.C. 1371, 1326 (C.D.Cal.1970).

(12)

Despite the fact that an "elongated blip" appeared directly in the path of the upbound M/V JACK D. WOFFORD, Pilot Van Meter took no steps to avoid a close quarters situation thereby failing to use his radar intelligently and fully. At trial, defendant was unable to carry its burden of showing that Van Meter's interpretation of radar imagery did not contribute to the collision. For reason of this violation of 33 U.S.C. § 2007, the *Pennsylvania* Rule is also applicable to defendants.

(13)

The use of radar, in and of itself, is not sufficient to exempt a vessel

from proceeding at a safe speed. *N.V. STOOMVAART MAATSCHAPPIJ v. Standard Oil Company of California,* 398 F.2d 835 (9th Cir.1968), *cert. denied,* 393 U.S. 980, 89 S.Ct. 448, 21 L.Ed.2d 441 (1968). In order [to be found] to travel at a safe rate of speed, a vessel should be able to stop within one-half the distance of visibility forward from her bow. When conditions are such that a vessel cannot proceed in such fashion, she should not be underway in the first place. *The Pennsylvania, supra* 86 U.S. (19 Wall.) at 134; *Holland-America Line v. M/V JOHS. STOVE,* 1968 A.M.C. 2012, 2016 (S.D.N.Y.1968). It is negligent for a vessel to be underway at all if her minimum speed is greater than that which would permit a complete stop within the limits of visibility. *Hogge v. S.S. YORKMAR,* 1977 A.M.C. 805, 832 (D.Md. 1977); *Barrois Bros., Inc. v. Lake Tankers, Inc.,* 188 F.Supp. 300, 303 (E.D.La. 1960), *affirmed per curiam,* 286 F.2d 573 (5th Cir.1961). Because the pilot of the WOFFORD was unable to see as far as the head of his tow, as established by cross-examination of Ronald Loughmiller at trial, he should not have had his vessel underway.[16]

(14)

"Risk of collision" means mere chance, peril, hazard or danger of collision,[17] and not an immediate danger. *The PHILADELPHIA,* 199 F. 299 (D.C.Pa. 1912), *affirmed,* 207 F. 936 (3rd Cir.1913). "Risk of collision" requires that navigators be prepared to do whatever safety demands. *Socony Vacuum Transportation Co. v. Gypsum Packet Co.,* 153 F.2d 773, 775 (2 Cir.1946). Pilot Van Meter had a functional radar which displayed an "elon-

---

**15.** Defendant's witness Loughmiller testified that an "object" was observed on the M/V JACK D. WOFFORD's radar prior to the collision. He testified that the radar was set on a one and one-half mile range at the time preceding the collision.

**16.** The Court finds the requirement that a vessel be able to stop within one-half of the distance of visibility [here 300 feet or less] is meaningless in this action; the WOFFORD could not have

stopped after it got a warning from the M/V SHELLY MOTT, prior to collision. She should have remained stationary at Mile 50 until the visibility improved and safe navigation again became possible.

**17.** Any impact sufficient to cause damage to a sound vessel is a "collision." *Cornell Steamboat Co. v. New York Central Railroad Co.,* 1933 A.M.C. 621 (S.D.N.Y.1933).

gated target." This should have warned him of danger and he should have cautiously investigated this target. Had he done this, the risk of collision he created by navigating in fog would have been more fully appreciated and some action might have been taken to avoid the collision. His violation of Rule 7 is a statutory fault and a contributing cause of the collision.

### (15)

■ The defendants violated Rule 8, of the Inland Navigational Rules, 33 U.S.C. § 2008 which provides in pertinent part: (e) If necessary to avoid collision or allow more time to assess the situation a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion.

At no time did Pilot Van Meter slacken his speed, stop, or reverse his engines. Had he done so, he might have avoided the collision with the M/V SHELLY MOTT. This statutory violation was a contributing cause of the collision.

### (16)

■ Defendants alleged that plaintiffs failed to maintain a proper radio watch prior to the collision, presenting a possible violation of 33 U.S.C. § 1203. In considering the merits of this contention, the Court first observes that the M/V SHELLY MOTT was moored to the bank and her engines were turned off. Had she been holding her position and that of her flotilla through use of engines against the current, she would have been "navigating" for purposes of the Vessel Bridge to Bridge Radiotelephone Act requirement of a listening watch for a towing vessel while navigating. *Allied Chemical Corp. v. Hess Tankship Co. of Delaware*, 661 F.2d 1044, 1053–54 (5th Cir.1981). A vessel which is "underway" for purposes of the Inland Rules must obey the Act. *Id.* at 1053–54. The Court, finding that the vessel was not underway, concludes that the Act is not applicable to plaintiffs and discerns no violation of 33 U.S.C. § 1203. As the M/V SHELLY MOTT was not underway, it was not required to sound fog signals in accordance with 33 U.S.C. § 2035.

*Id.* at 1052; *Barrois Bros., Inc. v. Lake Tankers, Corp., supra* at 303; Griffin on Collision §§ 134, 139. The M/V SHELLY MOTT was thus not required to man a radio watch or make fog signals and no statutory violation was committed in this respect.

### (17)

Both parties contributed to this collision by violating the statutory requirements for safe navigation embodied in the Inland Navigation Rules. Violation of these rules invokes the presumption of *The PENN-SYLVANIA, supra,* which requires that plaintiff and defendant prove that their respective violations could not have causally contributed to the collision. Both have failed to make this proof. Accordingly, liability for the damage sustained in this maritime collision is allocated according to the degree of the parties' comparative fault. *Valley Towing Service, Inc. v. SS AMERICAN WHEAT,* 618 F.2d 341, 346 (5th Cir.1980); *Portacci v. Moran Towing and Transportation Co.,* 615 F.2d 293, 294 (5th Cir.1980).

### (18)

■ If both parties to a collision are found to be guilty of statutory fault, the heavy presumption such fault contributed to the accident may be rebutted by proof that, in fact, the fault of either of the parties was the sole cause of the accident, or not a substantial contributing cause thereof. *Otto Candies, Inc. v. M/V MADELINE D,* 721 F.2d 1034, 1036 (5th Cir.1983); *Florida East Coast Railway Company v. Revilo Corporation, supra* at 1066. Because no such proof was adduced at trial, the Court concludes that each party was partially and substantially responsible for causing this accident.

### (19)

■ Maritime collision liability is predicated upon a finding of fault (a finding of negligent conduct) and the mere fact of physical impact has no legal consequence. *The JAVA, 81 U.S. 189, 190, 20 L.Ed. 834 (1872); Hogge v. S/S YORK-*

MAR, 434 F.Supp. 715, 727 (D.Md.1977); *Pennsylvania Railroad Co. v. S/S MARIE LEONHARDT*, 202 F.Supp. 368, 375 at n. 54 (E.D.Pa.1962). The fault found must be a contributing cause of the collision for liability to be imposed. *The PENNSYL-VANIA, supra;* Gilmore & Black, *The Law of Admiralty,* Section 7–5 (2d Ed.1975). The Court finds that each party was at fault and that such faults were contributing, legal causes of the collision. Further, the Court should assess damages in a collision case where both parties are at fault in whatever ratio it deems appropriate. *Allied Chemical Corp. v. Hess Tankship Co. of Delaware, supra* at 1057. As indicated in the Court's findings of fact, plaintiff bears a 33⅓ proportional fault, and defendant a 66⅔ proportional fault. Accordingly, damages will be assessed in that light.

(20)

The general rule in admiralty is that prejudgment interest should be awarded absent peculiar circumstances. *King Fisher Marine Service, Inc. v. The N P SUNBONNET*, 724 F.2d 1181, 1187 (5th Cir.1984); *Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401, 415 (5th Cir.1982), *cert. denied,* 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982). As no peculiar circumstances exist here, prejudgment interest shall be awarded. In admiralty, interest is usually awarded from the date of loss or injury to the vessel. *King Fisher Marine Service, Inc. v. The N P SUNBONNET*, 724 F.2d at 1187.

(21)

Judgment is rendered in favor of plaintiffs and against defendants in the amount of $19,454.01, plus legal interest from the date of injury, February 16, 1982. Each side shall bear its own costs.