**Donald L. WOODFORD and Diane O. Woodford, Plaintiffs,**

v.

**CAROLINA POWER & LIGHT COMPANY, Defendant.**

**No. 89–445–CIV–5–BR.**

United States District Court, E.D. North Carolina, Raleigh Division.

July 30, 1992.

Douglas Breen Abrams, Blanchard, Twiggs, Abrams & Strickland, Raleigh, N.C., for plaintiffs.

Kirk G. Warner, Yates, Fleishman, McLamb & Weyher, Joseph W. Yates, III, Kieran J. Shanahan, Patton, Boggs & Blow, Robert W. Kaylor, Carolina Power & Light Co., Raleigh, N.C., for defendant Carolina Power & Light Co.

Cross (or any other blood bank) is subject to a state statute of limitations.

## MEMORANDUM OPINION

BRITT, District Judge.

### I

This action was instituted on 15 June 1989 by plaintiffs, husband and wife, seeking damages as a result of injuries received by Donald L. Woodford (Woodford) in an accident which occurred on 20 March 1988 on the waters of Kerr Lake when the boat he was operating ran into an electric transmission tower owned by Carolina Power and Light Company (CP & L). Virginia Electric & Power Company and the United States of America were named as defendants but were later dismissed from the action. Inasmuch as this is an admiralty action, it was heard by the court in a trial conducted in Raleigh, North Carolina, in December 1991.

### II

From the stipulations contained in the pre-trial order and the evidence presented, the court makes the following:

### FINDINGS OF FACT

Woodford was born and reared in western Virginia. As a boy he fished often with his father and developed a love for the sport which stayed with him as he grew older. After serving a three-year hitch in the United States Army he returned to western Virginia and got married. He tried different occupations before becoming an employee with Chesapeake & Potomac Telephone Company in Roanoke, Virginia, where he was a cable splicer technician. He was an exemplary employee, receiving excellent performance ratings from his superiors and offers of positions in management, which he declined because of his love of outdoor work and a requirement that he move. He was diligent, productive and industrious, working many hours overtime during most pay periods. At the time of his injury, Woodford was earning approximately $50,000 per year. Mrs. Woodford is a homemaker, having retired from a position with the City of Roanoke to stay at home and care for her two sons.

In 1971 Woodford bought his first boat and fished frequently, often with his wife. After the boys were born, Woodford started fishing in tournaments as Mrs. Woodford was unable to go with him. He had just started teaching the boys, then 8 and 10, to fish when the accident happened.

Kerr Lake, also known as Buggs Island Lake, is a large, manmade impoundment lying in North Carolina and Virginia. It was constructed by the United States Army Corps of Engineers as a flood-control project and was formed by a dam on the Roanoke River. The lake is used for recreational purposes, including boating and fishing, and its dam provides hydroelectric power.

The steel electric transmission tower is part of an electric transmission line built by CP & L in 1930 and "reconfigured" in 1954 at the request of the Army Corps of Engineers. At that time it was on dry land, but the "reconfiguration" was done in anticipation of the completion of the dam and the filling of the reservoir, which occurred about three years later. The tower has stood in the navigable waters of Kerr Lake since.

The tower is the standard, enormous, four-legged pylon of the type used to carry high tension wires. It is a 115–foot–tall, pyramid-shaped, open structure comprised of a spidery framework of angle iron or steel members. It is approximately 30 feet wide on each side at its base, and it rests on cement footings at each corner. A length of iron or steel girder extends from corner to corner leaving, at the time of the accident, approximately two feet clearance above the water.

Freshwater fishing is a popular sport. The largemouth bass is a favorite quarry of freshwater fishermen throughout a large part of the southern and western United States. The array of equipment now made available is tremendous—from well-equipped boats to electronic equipment, to rods and reels, to lures. Clubs have been formed and tournaments frequently held at which prizes, including cash, are awarded for the most and largest fish caught within a given period of time.

Conservation is promoted, especially through a "catch-and-release" program in which fish are kept alive in aerated wells in the boat until they are weighed, at which time they are released to be pursued by another angler on another day. A professional circuit has been created where those most proficient in the sport earn a livelihood equal, in some instances, to that enjoyed by other modern sports professionals. Organizations have been formed to plan and manage tournaments which are often sponsored by businesses.

On 20 March 1988 Operation Bass, Inc. staged a bass tournament at Kerr Lake sponsored by Red Man Chewing Tobacco. Woodford was one of the entrants, having signed up in late December 1987 or early January 1988. As was his custom when participating in a bass tournament, Woodford went to the tournament site a few days early to practice and try to find "hot spots" where the fish might be caught. On 17 March 1988, accompanied by his friend, Michael Huffman (Huffman), Woodford pulled his 1986 Ranger bass fishing boat on a trailer behind his Chevrolet Blazer to Kerr Lake. They checked into a motel, went to the lake, launched the boat at Satterwhite Point which was to be the official starting point for the tournament, and spent the afternoon fishing. During the course of the afternoon they fished around the tower where the accident was to later occur. Woodford, who had fished around the tower before, described it as a "productive" spot and had it listed in a notebook which he kept of "favorite fishing spots". Friday and Saturday morning were also spent fishing and looking for hot spots, although the weather on Saturday was somewhat inclement with some rain and fog. Saturday's excursion was launched from Meekins Landing, some one and one-half miles southeast of Satterwhite Point, and the points fished were generally the same as those which had been fished on Thursday. Because of the bad weather Woodford and Huffman left the lake around noon and returned to their hotel. They registered for the tournament at 3 o'clock p.m. and had an early dinner.

As was customary on the afternoon before the tournament, a meeting of all registrants was held on Saturday. The rules of the tournament were explained, starting times assigned and a drawing held to determine partners. Also in accordance with custom, and apparently in an effort to prevent collusion and promote honesty, no entrant knew who his fishing partner for the tournament would be until the drawing was held. Woodford drew Ray Snavely (Snavely) whom he had never met. They conversed at that meeting and agreed to meet at Meekins Landing on Sunday morning. Huffman, who was at the tournament without a boat, drew a partner with a boat who he was scheduled to meet at Satterwhite Point on Sunday morning. Because of the large number of entrants in the tournament, it was suggested that some of them might want to launch from other ramps, including Meekins Landing, and travel by water to Satterwhite Point where the tournament was to begin. There was also a safety briefing for the boaters, at which time the tournament director, Daniel Grimes, specifically cautioned boaters about some hazards at Meekins Landing, including the tower.

Satterwhite Point is located at the confluence of Nutbush Creek and Mill Creek, the water from the two creeks flowing in a northeasterly direction. Meekins Landing is located on the south side of Mill Creek some one and one-half miles southeast of Satterwhite Point. CP & L's transmission line traverses Mill Creek northwest of Meekins Landing, between Meekins Landing and Satterwhite Point. The span of the transmission line, which runs in a northeasterly-southwesterly direction, is 1551 feet from shore to shore; the tower is located 1056 feet from the south shore and 495 feet from the north shore. The boat ramp at Meekins Landing is 1386 feet from the tower.

On Sunday, 20 March 1988, the day of the tournament, Woodford arose at 3 a.m., ate breakfast, went to Meekins Landing, and was one of the earliest boats to launch from that ramp. He was accompanied by Snavely, his assigned fishing partner, and Huffman, who was hitching a ride to Sat-

terwhite Point where he was to join his fishing partner. Woodford's boat was a typical bass fishing boat—17 feet, 10 inches long—with a high deck in the bow and stern for ease of fishing and a lower center section where the occupants normally sat when moving from place to place. It was equipped with a 150 horsepower Johnson outboard motor, three depth finders and a spotlight. The steering wheel and other controls were located behind a console amidship on the starboard side, and a passenger seat was located adjacent to the driver's seat on the port side. As they left the dock, Woodford was piloting with Snavely seated to his left and Huffman seated on the deck in the bow, somewhat to the port side, facing the rear. It was approximately 4:45 a.m., totally dark as it was a moonless night, and quite cold. Sunrise, on that date, would not occur until 6:17 a.m. Everyone on board was wearing a life jacket. As he pulled away from the dock, Woodford stayed to the right to avoid the shoals, or shallow water, on the left. A boat which had launched earlier had stopped and Woodford passed that boat on its right, easing on out into the channel. Using his depth finder as an aid to navigation, Woodford continued out into the channel until the water was 25 feet deep. Looking northwest he could see the lights at Satterwhite Point. Satisfied that he was in the main channel and seeing no obstruction between his position and Satterwhite Point, Woodford increased his speed sufficiently to get the boat on plane and then "backed off" the throttle achieving a cruising speed of 25 to 30 miles per hour. In a matter of seconds Snavely, who was not familiar with the area, saw the tower, yelled "tower", and fell to the floor. The boat hit the tower, went under the easternmost cross member, and came to rest with the bow pointing upward and resting on the inside of the northwest corner and the stern in the water. Woodford was severely injured and is now a paraplegic. Huffman received numerous injuries, including three broken ribs and a broken sternum, a concussion and a dislocated shoulder and elbow. Snavely was only slightly injured. The parties disagree on the direction the boat was travelling at the time it hit the tower. From the credible evidence presented, the court finds that it was travelling nearly west. When Woodford left Meekins Landing he went north, across Mill Creek, before turning to his left to go to Satterwhite Point. His direction then was generally west to northwest. He could see the lights of Satterwhite Point, and he was in deep (25 foot) water. He was much further north than he thought. Even so, he did not travel directly to the lights at Satterwhite, his destination. Rather, he was going 5 to 10 degrees starboard of that line. Snavely testified that the lights at Satterwhite were "to the port of straight ahead, about 11 o'clock" and this is entirely consistent with the court's analysis.

Plaintiffs contend, and the court agrees, that Woodford was disoriented, or confused, as to his location. He was much further across Mill Creek than he thought when he turned and accelerated his engine.

Woodford was removed from the scene by the local rescue squad and carried to Maria Parham Hospital in Henderson, North Carolina. Due to the severity of his injuries he was airlifted to Duke University Hospital in Durham, North Carolina. In July he went to rehabilitation centers in Virginia before returning to his home. He learned to drive a van which had been specially equipped for the handicapped. Mrs. Woodford cared for him day and night. He tried to return to work but, despite his best efforts and the help of management and his co-workers, he was unable to make it and retired.

Woodford has the usual problems of a paraplegic brought on by the inability of his bodily functions to operate normally and by his inability to move. For example, when he is lying in bed it is necessary for Mrs. Woodford, or someone, to move him frequently to prevent bedsores. He suffers a great deal of pain and takes several types of medication, some of which is for pain. As might be expected, he has no sexual functions. He is unable to fish from a boat, although he has fished from the bank on a few occasions. He is able to ride a yard tractor and mow the grass. He

is also able to work in his shop, doing woodwork.

## III

## DISCUSSION

By order dated 7 November 1991, 779 F.Supp. 827, the court held that CP & L had a duty to maintain lights on the tower, which is a hazard to navigation. There is no question that the tower was not lighted and, thus, that CP & L breached that duty. Left for determination is whether that breach was a proximate cause of the accident, whether Woodford was also negligent, and whether Woodford's negligence, if any, was a proximate cause of the accident. If it is determined that both parties were negligent, then the court must determine the degree of fault of each and apportion the damages incurred on a comparative fault basis. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).

■ A. Congress has established rules to govern traffic on the inland waters of the United States, 33 U.S.C. § 2001, *et seq.*, including the following which have a direct bearing on this action:

Rule 5. Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision.

33 U.S.C. § 2005.

Rule 6. Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions.

In determining a safe speed the following factors shall be among those taken into account:

. . . .

the state of visibility;

. . . .

the maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;

at night the presence of background light such as from shores (sic) lights or from back scatter of her own lights.

33 U.S.C. § 2006.

Rule 7. Every vessel shall use all available means appropriate to the prevailing circumstances and conditions to determine if risk of collision exists. If there is any doubt such risk shall be deemed to exist.

33 U.S.C. § 2007.

Rule 8(e). If necessary to avoid collision or allow more time to assess the situation, a vessel shall slacken her speed or take all way off by stopping or reversing her means of propulsion.

33 U.S.C. § 2008(e).

Under these rules a vessel, in order to be travelling at a safe speed, should be able to stop within one-half the distance of visibility forward from her bow. *Williamson Leasing Co. v. American Commercial Lines, Inc.*, 616 F.Supp. 1330, 1340 (E.D.La.1985). The reason for the one-half-sight distance is to allow a vessel coming from the opposite direction an equal stopping distance, thus avoiding a collision.

The ability to *SEE* where one is going is at the heart of the admiralty rules of the road. Indeed, lacking that ability the captain of a vessel is under a duty to stop. Rule 8(e); *Williamson,* supra. Obedient to that duty prudent captains on inland waters seek safe harbor or anchor well before nightfall. Of course, modern technology provides sea captains the ability to "see" by use of radar and other electronic means. Such technology does not, however, diminish the captain's duty to maintain a visual lookout. In this case there is no contention that the boat or the tower was equipped with any type of radar.

■ Travel on the open water is not accomplished by travelling along and within a defined lane or right-of-way. A vessel must always anticipate another vessel either stopped or approaching from *any* direction, as well as debris and other obstructions floating on or submerged just be-

neath the water. *Constant* vigilance is required.

■ B. It is quite obvious that Woodford has violated each and every one of the rules cited above. He did not "maintain a proper lookout at all times." He did not "proceed at a safe speed ... so that [ ]he could take proper and effective action to avoid collision." Not only did he *not* "reduce ... speed according to the poor state of visibility", as required by Rule 6, he *increased* his speed in spite of the poor state of visibility. Though he was disoriented, he did not slacken his speed or stop to "allow more time to assess the situation."

Woodford was *very* familiar with Mill Creek and the entire area, including the exact location of the tower. He had fished around the tower on many occasions over a period of years and had even listed it in his book of "hot spots" because he liked to fish there. He had fished around the tower on two of the three days preceding the accident. He had been *specifically warned* about the tower the afternoon before the accident by the tournament director.

There was no reason for Woodford and his colleagues to be in a rush to get from Meekins Landing to Satterwhite Point. The entire distance between the two was only one and one-half miles. Civil twilight, the time when artificial illumination would no longer be needed, would occur at 5:51 a.m. and sunrise at 6:17 a.m. The accident occurred at 4:45 a.m. It is obvious that the boat was in the water and had left the landing before that time. At six miles per hour the boat could have reached Satterwhite Point in 15 minutes, well before even civil twilight. Prudence and good seamanship dictated that he leave Meekins Landing and travel at a speed which would allow him to stop within one-half the distance of his visibility until he arrived at his destination.

Counsel for plaintiffs contend that had the tower been lighted the accident would not have happened and Woodford would not have been injured because he would have seen the lights. This is probably true, but it does not end the court's inquiry.

The court cannot judge the conduct of CP & L in a vacuum—it must be judged in relation to the conduct of others. When judged in relation to the conduct of Woodford, as above set out, it is clear that had Woodford followed the rules by which *his* conduct must be judged the accident would not have happened.

Left to be determined is the comparative fault of Woodford and CP & L in causing the accident and, importantly, the resulting injuries. The court concludes that Woodford's negligence was the overwhelming cause of the accident and the terrible injuries he suffered. Even had the tower been lit, Woodford was violating every single rule of safety relied on by the court in this decision. In the final analysis, it was *SPEED* that caused this tragedy and the horrible injuries. Bass boats, such as Woodford's, are equipped to move quickly from place to place so that the fisherman can cover more territory in a given period of time and, hopefully, catch more fish. His boat had a 150 h.p. motor and a "cupped" prop to make it get out of water, and onto plane, quicker. These are desirable features on a bass boat and, when used properly, can help pay handsome dividends. However, they do not supplant the duty of the operator of a boat to follow the rules of safety. Rather, they increase his duty to be vigilant. Had Woodford been travelling at a safe speed it is quite likely that the accident would not have happened. And, even if a collision had occurred his injuries, if any, would have been much less severe.

IV

From the foregoing findings of fact, the court makes the following:

CONCLUSIONS OF LAW

A. The court has jurisdiction of this action pursuant to 28 U.S.C. § 1333.

B. Carolina Power & Light Company was negligent in failing to light its tower located in the navigable waters of Kerr Lake.

C. Donald L. Woodford was negligent in the operation of his boat on 20 March 1988.

D. The negligence of Carolina Power & Light Company contributed 5% to the accident on 20 March 1988 and the injuries sustained by Donald L. Woodford.

E. The negligence of Donald L. Woodford contributed 95% to the accident on 20 March 1988.

F. Carolina Power & Light Company does not contend that it suffered any damages as a result of the accident. Thus, the only damages to be apportioned are those suffered by the Woodfords.

G. The amount of damages to which Donald L. Woodford and Diane O. Woodford are entitled to recover from Carolina Power & Light Company will be determined by separate order.